AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. 1:22-mj-80 |
| 294 South Walnut Street | ) | |
| Wilmington, Ohio 45177 | ) | |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

SEE ATTACHMENT A

located in the _____ Southern _____ District of _____ Ohio _____, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❒ contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1), 846 | Conspiracy to Distribute and Distribute or Possess with the Intent to Distribute Controlled Substances |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

❒ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Eric J. McIntosh, Special Agent, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

**via FaceTime video** _____ *(specify relia*

Date: **Feb 9, 2022** _____

Karen L. Litkovitz
United States Magistrate Judge

City and state: Cincinnati, Ohio _____

## ATTACHMENT A

*Property to Be Searched*

The property to be searched is 294 South Walnut Street, Wilmington, Ohio 45177

(**TARGET RESIDENCE 2**), pictured below, and further described as a single-family residence

with tan siding, white trim, a light green front door, and an address number of "294" in black

letters posted on a white porch beam, over the front steps.



**ATTACHMENT B**

*Items to be Seized*

All items and records relating to violations of Title 21 U.S.C. §§ 841 and 846, those violations involving Christian Wayne BURTON and/or others and occurring on or after November 1, 2021, including:

a.  Any and all controlled substances (as defined under Title 21, United States Code, § 812), including, but not limited to, methamphetamine and fentanyl;

b.  Paraphernalia associated with the manufacture, distribution, sale, import, export, storage, conversion, preparation for sale and use of any controlled substances, including scales, measuring devices, bottles, balloons, baggies, plastic wrap, plastic envelopes, film canisters and cutting, conversion, and adulteration agents.

c.  Records showing evidence of importing, smuggling, and distributing drugs, including books, ledgers and diaries, address books and lists, buyer and seller lists, notebooks, IOU's, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records, wire transfer records, express consignment mailing labels (including Federal Express, DHL, U.S. Postal Express Mail, UPS, and other similar labels), evidence of offsite storage (such as storage locker receipts and safety deposit box rental records and keys), documents showing domestic or international travel (such as airline tickets, itineraries, passports, and the like), and receipts showing imports or exports (such as shipper's export declarations, bills of lading, invoices, tax identification number paperwork, and other similar documents).

d.   Currency (whether U.S. or foreign) and financial instruments, including travelers checks, bonds, stock certificates, cashier's checks, certificates of deposit, and money orders, derived from the sale of controlled substances in violation of Title 21, United States Code, § 841 and money wrappers, rubber bands, money containers, and money counting machines.

e.   Precious metals, jewelry or other high-value items that could be obtained with the proceeds of the sales of controlled substances.

f.   Any and all records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other high-value items that could be obtained with the proceeds of the sales of controlled substances.

g.   Any boxes, bags, briefcases, suitcases, containers, or other items that could be used to mail, carry, import, export, smuggle, or transport marijuana or any other controlled substances.

h.   Photographs (both paper and digital form) and video and audio recordings which document an association with other co-conspirators and/or display drug trafficking methods, narcotics, firearms, or money and proceeds from narcotics transactions.

i.   All records, documents, and materials showing control, possession, custody, dominion or other indicia of occupancy over physical premises, including but not limited to:  personal mail, checkbooks, personal identification, personal effects, notes, other correspondence, utility and other bills, internet service provider documents, letters, rent receipts, mortgage and loan documents,

financial documents, vehicle registration information or ownership warranties and keys.

j.   Electronic or communication devices including, but not limited to, cellular telephones, smart phones, portable electronic devices such as tablet computers, laptops, iPads or electronic storage media, and other electronic or communication devices which could be used to facilitate drug trafficking.

k.   Firearms and ammunition;

l.   Firearms accessories, such as ammunition, ammunition magazines, silencers, gun cases, magazines and spare parts;

m.   Firearms source records, including lists of prices, correspondence, notation logs, receipts, journals, books, telephone records, telephone bills, address books, bank statements, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold;

n.   Photographs, video and audio recordings, text messages, chats, emails and other communications (and associated contact information), in electronic or other form, related to the possession, acquisition or transfer of firearms, firearms parts and accessories, or ammunition;

o.   Firearms boxes, manuals, and receipts or other paperwork related to firearms transactions;

p.   United States currency or other items of value representing the proceeds of firearms trafficking and/or drug trafficking;

      q.  Documents pertaining to the importation of firearms and/or ammunition and proceeds derived from the sale therefrom, including invoices, shipping labels, tracking numbers, boxes, and envelopes

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

    2.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant ("COMPUTER"):

      a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

      b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      c.  evidence of the lack of such malicious software;

      d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.   evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.   evidence of the times the COMPUTER was used;

i.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.   records of or information about Internet Protocol addresses used by the COMPUTER;

l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.   contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing

or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**IN THE MATTER OF THE SEARCH OF:**
**294 SOUTH WALNUT STREET,**
**WILMINGTON, OHIO 45177**

**Case No.** __1:22-mj-80__

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION UNDER RULE 41 FOR A**
**WARRANT TO SEARCH AND SEIZE**

I, Eric J. McIntosh, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search three premises (collectively, "PREMISES"):

  a.  464 Thorne Avenue, Wilmington, Ohio 45177 (**TARGET RESIDENCE 1**);

  b.  294 South Walnut Street, Wilmington, Ohio 45177 (**TARGET RESIDENCE 2**),

      further described in Attachment A, for the things described in Attachment B; and

  c.  A 1999 tan Cadillac Escalade, Ohio license plate JDJ6354 (**CADILLAC**

      **ESCALADE**).

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have

been since August of 2003.  My primary duties as a Special Agent consist of investigating

criminal enterprises, narcotics investigations, organized crime, and violent crimes to include

unlawful possession and possession with the intent to distribute of controlled substances, as well

as the associated conspiracies in violation of Title 21, United States Code, Sections 841, 843 and

846.  I am familiar with federal firearms laws, and investigations into possession of a firearm by

a convicted felon, possessing a firearm in furtherance of a drug trafficking crime and the

1

associated violations of Title 18, United States Code, Sections 922 and 924. As part of my standard training to become a Special Agent with the FBI, I have received specialized training in the means and methods by which individuals and drug trafficking organizations conduct their illegal drug trafficking activities, as well as in the use of various investigative techniques used to uncover unlawful drug trafficking organizations. Based upon my experience and training, I am familiar with the ways in which drug traffickers conduct their unlawful drug trafficking activity, including, but not limited to, their use of code words and numbers to conduct their transactions, their use of multiple telephones to conduct their illegal activities, their methods for concealing narcotics and narcotics proceeds and their use of firearms, violence, and threats of violence to protect their criminal organization. I have received further specialized training concerning the interception of wire communications.

      3.     I have participated in various types of electronic surveillance, including the interception of wire communications, in investigations of drug traffickers, money launderers and violent criminal enterprises. I am also familiar with, and have personally participated in, other normal methods of investigating criminal enterprises, including, but not limited to, visual surveillance, the questioning of witnesses, the use of informants, undercover operations, and the use of pen registers, including pen registers in the form of digital analyzers.

      4.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## **PROBABLE CAUSE**

      5.     The United States, including the FBI, is conducting a criminal investigation of Christian Wayne BURTON and other co-conspirators, both known and unknown, regarding possible violations of possession with intent to distribute controlled substances and conspiracy to

distribute controlled substances, in violation of Title 21, U.S.C., §§ 841(a)(1) and 846 (collectively referred to as the "Subject Offenses"). Specifically, the FBI Cincinnati field office, the Warren County Drug Task Force ("WCDTF"), and the Wilmington Police Department ("WPD") are investigating a Wilmington area, poly-drug distribution network led by BURTON.

6.          As I describe in detail below, BURTON uses **TARGET RESIDENCE 1** and **TARGET RESIDENCE 2** in furtherance of his drug trafficking activities, and regularly drives the **CADILLAC ESCALADE**.[1] **TARGET RESIDENCE 1** is rented by a close female associate of BURTON. BURTON lists **TARGET RESIDENCE 2** as his home address on his valid Ohio driver's license and car registration.

**A.  Law enforcement conducted a controlled buy from BURTON at TARGET RESIDENCE 1.**

7.          In the winter of 2021, law enforcement agents learned via a trustworthy and reliable confidential source ("CS") that BURTON was currently selling heroin/fentanyl from 464 Thorne Ave., Wilmington, Ohio 45177 (**TARGET RESIDENCE 1**). Law enforcement initiated an investigation into BURTON using law enforcement officers acting in an undercover capacity ("UCs").

8.          On December 12, 2021, UC-1 purchased approximately 3.5 grams of fentanyl[2] from BURTON for $200 at **TARGET RESIDENCE 1**. UC-1 arranged the drug transaction by

---

[1] As I referenced above, the **CADILLAC ESCALADE** is a 1999 tan Cadillac Escalade, Ohio license plate JDJ6354. It is registered to Raymond J. Sardinas, 561 Paris Avenue, Apartment B, Wilmington, Ohio 45385 but is known by agents and officers to be used by BURTON. As I describe in more detail below, Sardinas is BURTON's sister's boyfriend.

[2] As I discuss further below, agents ultimately conducted two controlled purchases from BURTON. BURTON agreed to sell the fentanyl and/or methamphetamine and the purchased substances field-tested positive for fentanyl and/or methamphetamine. The controlled purchases were audio recorded. All purchased substances were sent to a laboratory for forensic analysis.

3

contacting BURTON at cellular telephone number (937) 347-7891.[3] UC-1 and BURTON had

the following text message exchange:

| UC-1 | Good to play baseBALL tomorrow? |
|------|------|
| BURTON | Yep just hit me up. |
| UC-1 | What time around the same as usual? |
| BURTON | Yea that works |
| UC-1 | Hell yeh, I'll text when I head that way |
| BURTON | [Thumbs up emoji] |

9.      I know, based on my training and experience, that when UC-1 asked BURTON if

BURTON was good to "play baseBALL," UC-1 was using coded language to ask whether

BURTON was ready to sell UC-1 an "eight ball," meaning 3.5 grams of fentanyl.[4]

10.      The next day, on December 13, 2021, at approximately 1:16 p.m., UC-1 contacted

BURTON to arrange their meeting:

| UC-1 | Getting ready to roll ur way. |
|------|------|
| BURTON | Can you meet me at 464 Thorne **[TARGET RESIDENCE 1]**? |

---

[3] (937) 347-7891 is a cellular telephone number serviced by AT&T and subscribed to Charlotte Cox, with a billing address of 294 South Walnut Street, Wilmington, Ohio 45177 (**TARGET RESIDENCE 2**). Cox is BURTON's grandmother. I know, based on my training and experience, that drug traffickers frequently list family members as the subscribers. UC-1 used this number to contact BURTON throughout the investigation.

[4] I know, based on my training and experience, that drug traffickers and drug users frequently use coded language when arranging drug sales to evade detection by law enforcement. An "eight ball," which is approximately an eighth of an ounce (ranging from 3 to 3.5 grams) of an illegal drug, is a commonly used term; therefore, I believe that BURTON understood the capitalization of "baseBALL" to refer to this amount.

4

11.     Following this exchange, UC-1, as surveilled by agents and officers, drove to **TARGET RESIDENCE 1**, parked on the street directly across from **TARGET RESIDENCE 1**, and told BURTON that UC-1 had arrived:

| UC-1 | I'm out here. |
|------|---------------|
| **BURTON** | Coming out |

12.     A short time later, agents and officers observed BURTON[5] exit the front door of **TARGET RESIDENCE 1**, walk across the street to UC-1's car, and hand UC-1 approximately 3.5 grams of fentanyl (total package weight of 4.6 grams) in exchange for $200 in pre-recorded buy money.  Surveillance agents and officers then observed BURTON walk back across the street and enter **TARGET RESIDENCE 1**.

13.     While conducting surveillance of **TARGET RESIDENCE 1** on December 13, 2021, agents observed several people coming and going from **TARGET RESIDENCE 1** in a short amount of time.  Based on my training and experience, I believe that the activity observed during the surveillance is consistent with drug trafficking occurring from the residence.

**B.  Law enforcement conducted a controlled buy from BURTON at TARGET RESIDENCE 2.**

14.     On December 16, 2021, two UCs purchased approximately 3.5 grams of fentanyl and approximately one ounce of methamphetamine from BURTON for $550 at 294 South Walnut Street, Wilmington, Ohio 45177 (**TARGET RESIDENCE 2**).  UC-1 arranged the drug transaction by contacting BURTON at cellular telephone number (937) 347-7891:[6]

---

[5] The UC and surveillance agents and officers compared the individual observed on December 13, 2021, with a state of Ohio driver's license photograph of BURTON and determined them to be one and the same.

[6] This is the same phone number BURTON used to communicate with UC-1 on December 12, 2021, and December 13, 2021, described in more detail above.

| UC-1 | Good for some baseBALL today around same time? |
|------|---|
| UC-1 | good for some ice cream while playin ball? |
| BURTON | Yep I got you |
| UC-1 | My dude wants to try a zip of the cream if u can and how much? |
| BURTON | 350 |
| UC-1 | 550 for both then? |
| BURTON | Yep. |
| UC-1 | U do 3 on zip if he wants more than a zip is that price all the way out? |
| BURTON | Yea I would do 3, if he got more then 1. |
| UC-1 | K, u do 3 on zip today and fire he wants more, my dude said he will make ur money if fire he will be back. |
| BURTON | He can try it first before he buys if he wants. |
| UC-1 | He said he would do 350 today if 3 on multiple later. |
| BURTON | that's fine |
| UC-1 | Cool I'll hit you on my way. |

15.     I know, based on my training and experience, that in the above text message exchange, UC-1 and BURTON arranged for UC-1 to purchase more fentanyl from BURTON, and discussed UC-1's friend's interest in purchasing methamphetamine from BURTON. Specifically, UC-1 asked BURTON if BURTON was ready to sell an "eight ball," meaning 3.5 grams of fentanyl, using the same coded language as before: "baseBALL." UC-1, after also inquiring about "ice cream," told BURTON that a friend wanted to purchase "a zip of the

cream." I know, based on my training and experience, that drug traffickers and drug users use several code names to refer to methamphetamine, including "ice" and "ice cream," due to methamphetamine's crystal-like appearance. I also know that a "zip" refers to one ounce. UC-1 and BURTON then discussed prices, with BURTON offering methamphetamine at $300 per ounce if UC-1's friend purchased more than one ounce.

16.     Later that same day, at approximately 1:46 p.m., UC-1 texted BURTON:

| UC-1 | Getting ready to roll ur way. |
|------|-------------------------------|
| BURTON | Ight. |

UC-1 and UC-2 then drove to the Wilmington area, and UC-1 continued texting with BURTON:

| BURTON | I'm on Walnut |
|--------|---------------|
| UC-1 | U want me to come there? |
| BURTON | Yea. |

17.     Agents established surveillance near **TARGET RESIDENCE 2** before the controlled drug purchase.  Surveillance agents and officers observed BURTON sitting alone in the driver's seat of the **CADILLAC ESCALADE** parked in front of **TARGET RESIDENCE 2**.  Agents and officers observed multiple individuals separately approach the driver's side of the **CADILLAC ESCALADE** and have brief interactions with BURTON before leaving the area. Based on my training and experience, I believe that those individuals were engaging in hand-to-hand drug transactions with BURTON.

7

18. The UCs, as surveilled by agents and officers, drove to **TARGET RESIDENCE 2** and parked on the street directly across from **TARGET RESIDENCE 2**. Seeing the UC officers park on the street, BURTON stepped off the porch of **TARGET RESIDENCE 2**, walked to the driver's side of the UC vehicle, and stated "Aight, look, this ice (methamphetamine) is one gram short and the slow (heroin/fentanyl)[7] is half a gram short, but I'll have it in an hour." BURTON then handed the UC an untied bag containing approximately one ounce of methamphetamine (total package weight of 26.8 grams) and a smaller tied baggie containing approximately 3.5 grams of fentanyl (total package weight of 3.9 grams). BURTON asked, "You cool with that or what?" and UC-1 replied, "Yeah." BURTON then said, "It's 27 grams of ice and 3 grams of slow. You don't like the white shit, I'll have some gray shit in an hour, the half gram will be gray." The UCs then departed the area.

19. I know, based on my training and experience, that when BURTON said, "You don't like the white shit, I'll have some gray shit in an hour, the half gram will be gray," BURTON was referring to different types/purities of heroin/fentanyl. Drug traffickers use many different "cutting" agents to dilute the drugs to increase their profits. Because of the variety of cutting agents available, different sources of supply can sell the same drug, but those drugs may vary in appearance and/or potency. Therefore, BURTON's statements that he would be able to sell the UCs either "white" or "gray" fentanyl suggests that BURTON is supplied fentanyl from multiple sources.

**C. The evidence suggests that BURTON continues to use TARGET RESIDENCE 1, TARGET RESIDENCE 2, and the CADILLAC ESCALADE to traffic drugs.**

20. From January 19, 2022, to present, agents have been receiving state of Ohio court-authorized global positioning system (GPS) vehicle location data for the **CADILLAC**

---

[7] I know, based on my training and experience, that "slow" is a street term for heroin/fentanyl.

ESCALADE.[8] The GPS location data shows that BURTON resides overnight routinely at **TARGET RESIDENCE 1** and **TARGET RESIDENCE 2**, frequently spending time at each residence on any given day. The GPS data reflects that BURTON spends the vast majority of his time at **TARGET RESIDENCE 1** and **TARGET RESIDENCE 2**, which is consistent with BURTON using those locations to deal drugs.

21. On January 28, 2022, GPS vehicle location data for the **CADILLAC ESCALADE** indicated that BURTON stopped at an ATM before traveling to **TARGET RESIDENCE 2,** where he stayed for approximately ten minutes. BURTON then traveled to the Dayton, Ohio area, a known source location for methamphetamine and fentanyl. After stopping at a Dayton-area residence for a little over an hour, GPS vehicle location data indicated BURTON was traveling back to Wilmington, Ohio.

22. At approximately 2:53 p.m., during BURTON's drive back to Wilmington, an Ohio State Highway Patrol ("OSHP") marked police vehicle conducted a traffic stop of BURTON's **CADILLAC ESCALADE**. The OSHP Trooper identified the driver of the car as BURTON, with an adult female and adult male passenger, noting that all three individuals appeared to be nervous. The OSHP Trooper asked BURTON to exit the car so he could conduct a consensual pat down of BURTON's person. The OSHP Trooper felt brass knuckles in BURTON's right front pocket and a large bulge in the crotch area of BURTON's pants. BURTON was placed in handcuffs, was advised of his *Miranda* Rights, and was placed in the rear of the OSHP Trooper's vehicle. BURTON repeatedly denied having anything concealed in his pants. The OSHP Trooper removed BURTON from the OSHP patrol car and again felt the large bulge further down BURTON's pant leg. The OSHP Trooper removed BURTON's left

---

[8] Physical observation and surveillance confirmed that BURTON has been the sole driver of the **CADILLAC ESCALADE** during this time.

hand from handcuffs and BURTON removed a plastic bag containing approximately four ounces of methamphetamine (total package weight of 112.0 grams). Four ounces of methamphetamine is a trafficking amount and is not consistent with personal use. Based on my training and experience, I believe the street value of this amount of methamphetamine is approximately $1,600.

23.    BURTON gave consent for the search of the **CADILLAC ESCALADE** and told the OSHP Trooper that there were scales in his car. I know, based on my training and experience, that drug traffickers frequently use scales to measure the drugs they receive from their sources of supply and to measure drugs to sell to users. The OSHP Trooper searched the car but did not find any other contraband; however, the OSHP Trooper noted the presence of two empty handgun holsters in the car.

24.    Ultimately, BURTON, the adult female passenger, and the adult male passenger were released knowing possible state of Ohio drug charges would be filed. GPS vehicle location data indicated the **CADILLAC ESCALADE** made a few short stops in the Wilmington area before returning to **TARGET RESIDENCE 2,** where the vehicle stayed overnight.

25.    I know, based on my training and experience, that drug trafficking is a cash-based business; therefore, I believe BURTON's stop at an ATM prior to his trip to Dayton is consistent with obtaining a trafficking amount of methamphetamine.

26.    On February 7, 2022, agents and officers conducted surveillance near **TARGET RESIDENCE 1** and **TARGET RESIDENCE 2**.  Prior to establishing surveillance, I noticed the GPS vehicle location data indicated BURTON's **CADILLAC ESCALADE** had not moved from a location on the side of route 63, between Xenia and Wilmington, since February 2, 2022. An officer drove by the location and noted BURTON's **CADILLAC ESCALADE** appeared to

be broken down and parked. At approximately 2:00 p.m., surveillance officers observed BURTON exit **TARGET RESIDENCE 2** and work on a flat-bed tow truck parked near the residence. At approximately 3:22 p.m., a surveillance officer at **TARGET RESIDENCE 1** observed a maroon Pontiac minivan, bearing Ohio license plate JIV1835, park at the house and an older white male get out of the driver's seat. The individual knocked on the door of the house and then placed a call on a cellular telephone when there was no answer at the door. The person then got back in the Pontiac minivan and departed the area. At approximately 3:37 p.m., surveillance officers at **TARGET RESIDENCE 2** observed the Pontiac minivan park near the house and the driver and a second adult male passenger get out of the van and walk to **TARGET RESIDENCE 2**. After a short amount of time, the two individuals from the Pontiac minivan and a third adult male exited from **TARGET RESIDENCE 2** and left on foot.

27.     Ohio license plate JIV1835 on the maroon Pontiac minivan is registered to Raymond Sardinas, 294 South Walnut Street, Wilmington, Ohio 45177 (**TARGET RESIDENCE 2**). As noted above,[9] this is the same individual listed on the registration for the **CADILLAC ESCALADE** BURTON uses. Agents and officers know Raymond Sardinas as the boyfriend of BURTON's sister and is a known drug abuser. Based on my training and experience, I know that drug dealers often register their vehicles in the names of drug customers/users in exchange for drugs in an effort to deter law enforcement detection.

### D. Evidence from a shooting, a traffic stop, and a threatened shooting suggests that BURTON carries a firearm.

28.     On January 12, 2022, at approximately 4:19 p.m., the WPD responded to **TARGET RESIDENCE 2** for a call of a shooting in the area. BURTON and two other adult males were standing on the porch of **TARGET RESIDENCE 2** when Charles BROOKS

---

[9] *See* paragraph 6, footnote 1.

("BROOKS") and another adult male were walking on South Walnut Street and approached them.  Eyewitnesses stated BURTON and BROOKS had a verbal dispute from a sizeable distance apart.  BURTON and the two adult males on the porch told police officers that BROOKS threatened to "blaze"[10] them before BROOKS pulled out a handgun and fired several shots at them.  BURTON and the two adult males said BROOKS was standing near Hawley Avenue and South Walnut Street when BROOKS shot at them.  Additional eyewitnesses said BURTON retrieved a handgun from **TARGET RESIDENCE 2** and shot once at BROOKS, and BROOKS fired two shots back at BURTON.

29.     After the shooting, multiple eyewitnesses observed BROOKS and the adult male with him flee the area on foot.  WPD officers recovered a bullet that struck a parked vehicle on South Walnut Street and three .380 shell casings near Hawley Avenue and South Walnut Street, where BROOKS had been standing.  WPD officers learned the dispute was likely over a female acquaintance of BURTON and BROOKS.  BROOKS is in state custody and state Felonious Assault and Weapons Under Disability charges against BROOKS are pending.

30.     On January 28, 2022, during the traffic stop I described in more detail above, the OSHP Trooper noted the presence of two handgun holsters in the **CADILLAC ESCALADE**, suggesting that BURTON has a firearm he may keep or transport in his car.

31.     On January 30, 2022, at approximately 3:26 a.m., the WPD responded to **TARGET RESIDENCE 1** for a call involving a domestic dispute between BURTON and Gabrielle Nicole DRAKE ("DRAKE").  DRAKE had called 911 reporting that BURTON had been at her residence (**TARGET RESIDENCE 1**) and threatened to shoot her and, as witnessed

---

[10] Based on my training and experience, I know that "blaze" is slang for shooting someone.

by others at the house, BURTON would not allow her to leave. Eventually, DRAKE was able to able to leave the residence, go to her mother's house, and call 911.

32. Responding officers arriving at **TARGET RESIDENCE 1** encountered BURTON attempting to leave the house. WPD officers obtained conflicting witness statements from BURTON and other individuals at the house and eventually requested DRAKE return to the residence. DRAKE arrived at the house and gave WPD officers consent to search her residence for a firearm. DRAKE told officers the attic was a likely place BURTON would hide his firearm. Officers opened the ceiling attic access door and a handgun fell to the floor. Officers seized a Lorcin, Model L9MM, 9 mm handgun, serial number L066080, loaded with three rounds of ammunition (one round in the chamber).

33. I know, based on my training and experience, that drug traffickers frequently use firearms as part of their illicit drug trafficking business. As I explain in more detail below, traffickers use firearms to protect their product and their drug trafficking proceeds from rival drug dealers and/or from those seeking to rob them. Therefore, I believe BURTON's possession of firearms is consistent with drug trafficking.

**E. TARGET RESIDENCE 1, TARGET RESIDENCE 2, and the CADILLAC ESCALADE likely contain evidence relevant to my investigation.**

34. BURTON lists 294 South Walnut Street, Wilmington, Ohio 45177 (**TARGET RESIDENCE 2**) as his home address on his valid Ohio driver's license and in public source databases. BURTON has an active car registration listing **TARGET RESIDENCE 2** as BURTON's residence.

35. Gabrielle Nicole Drake lists 464 Thorne Avenue, Wilmington, Ohio 45177 (**TARGET RESIDENCE 1**) as her home address on her valid Ohio driver's license and in public source databases. Officers and agents determined that Gabrielle Nicole Drake rents

13

**TARGET RESIDENCE 1** from the owners of the residence. Gabrielle Nicole Drake is known by officers and agents as a female acquaintance of BURTON.

36. Physical and electronic surveillance of the **CADILLAC ESCALADE** confirm that BURTON regularly uses this vehicle to travel between **TARGET RESIDENCE 1** and **TARGET RESIDENCE 2**. Current GPS location data and physical surveillance conducted on February 8, 2022, confirm that the **CADILLAC ESCALADE** is presently on South Walnut Street in Wilmington, Ohio, just south of **TARGET RESIDENCE 2**.

37. Based on my training and experience, and my knowledge of the investigation to date, including the GPS tracker data, controlled buys, and the observations of agents, I believe that BURTON is using **TARGET RESIDENCE 1** and **TARGET RESIDENCE 2** as his residences and also uses **TARGET RESIDENCE 1** and **TARGET RESIDENCE 2** daily in furtherance of his drug trafficking. I also believe that BURTON uses the **CADILLAC ESCALADE** to sell drugs directly to customers (such as during the hand-to-hand drug transactions officers observed in December 2021) and to travel to source locations to procure drugs (such as when BURTON drove to an ATM and then Dayton before being traffic stopped with a substantial amount of methamphetamine). I believe that BURTON stores his drugs, drug proceeds, tools of the drug trafficking trade, firearms and ammunition, and other relevant evidence at the PREMISES.

38. Based upon my training and experience, my participation in this investigation, and other drug trafficking investigations, I have reason to believe that:

    a. drug traffickers often place assets in names other than their own to avoid detection of these assets by government and law enforcement agencies;

b. drug traffickers often place assets in names of business/corporate entities as nominee title holders in order to avoid detection of these assets by government and law enforcement agencies; even though these assets are placed in the names of other persons or entities, the drug traffickers continue to use these assets and exercise dominion and control over them;

c. drug traffickers must maintain and/or have quick access to large amounts of United States currency or other liquid assets in order to maintain and finance their ongoing drug business;

d. drug traffickers often maintain money counting machines, money wrappers and rubber bands, boxes, bags, brief cases, suitcases, or containers used to carry drug proceeds and/or controlled substances;

e. drug traffickers often maintain in their residences and/or business establishments records relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed including some or all of the following written books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers (i.e. bank account records, wire transfer records, bank statements, safe deposit box keys and records, money wrappers, rubber bands, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the illegal sale of drugs);

f. drug traffickers commonly use cellular phones to communicate with other members of the drug trafficking organization (DTO), narcotics source of supply(s), and/or

narcotics customers in furtherance of violations of the Uniform Controlled Substances Act;

g.  drug traffickers commonly provide illegal narcotics to their organization on consignment sale to their customers, who subsequently pay for the drugs after reselling said drugs. Therefore, the above-mentioned books, records, receipts, notes, ledgers, etc., will be secured by the drug traffickers within their residences and/or their businesses for their ready access for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

h.  drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone numbers of drug associates within their residence and/or place of business, their business vehicles, or the curtilage of their residence or business for ready access and to hide them from law enforcement agencies;

i.  drug traffickers commonly will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services (i.e., safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts), and evidence of this includes documents like stock certificates, bonds, deposit certificates, and travelers checks;

j.  drug traffickers often have photographs or video movies of themselves, their co-conspirators, and the property and assets purchased with drug proceeds. These photographs and video movies are normally in the drug traffickers possession, their residence and/or their place of business;

16

k.  drug traffickers' methods of transporting drugs include but are not limited to: commercial airlines, private motor vehicles, and government and contract mail carriers. I know that the vehicles, residences, or business locations of drug traffickers will often contain records of drug-related travel. These records may include airline ticket receipts, credit card receipts, traveler vouchers, hotel and restaurant receipts, photographs, canceled checks, maps, and written directions to locations rental car receipts and luggage tags reflecting points of travel;

l.  drug traffickers commonly have firearms in their possession (on their person, at their residence, and/or their business) including but not limited to handguns, rifles, shotguns and automatic weapons. These firearms are most often used and/or maintained in order to protect and secure a drug trafficker's property or manufacturing operation;

m.  it is common for drug traffickers to secrete in vehicles they use the items identified in the above paragraphs;

n.  drug traffickers will often accumulate and maintain substantial amounts of drug proceeds, specifically currency, over a period of years, so that the proceeds can be used in later years for personal asset acquisitions and/or expenditures during periods when a drug trafficker is not distributing drugs;

o.  drug traffickers commonly will maintain residence(s) separate from their primary residence to serve as "safe houses" where the traffickers may stay for periods of time; I know that these residences which may be occupied by other conspirators or associates may contain elements of the traffickers drug crimes to include all items noted above;

p. drug traffickers commonly have evidence of purchases of goods used in the manufacture of controlled substances secreted in their residences, businesses, or vehicles; and

q. drug traffickers commonly secret in their residences and/or places of business, over a period of years, items such as those identified in the above paragraphs.

39.     In sum, I know, based on my training and experience, that drug traffickers frequently use multiple residences for the purpose of storing illegal drugs, records of drug transactions, large amounts of financial instruments including currency, jewelry, precious metals, and other items purchased with drug proceeds; and that such residences often contain evidence of co-conspirator activity, and financial transactions related to obtaining, transferring, secreting, or spending large sums of money made from engaging in illegal drug trafficking activities.  I also know that drug traffickers often use private vehicles to obtain and transport their drugs, drug proceeds, firearms and ammunition, and other tools of the drug trafficking trade. I therefore believe BURTON is currently using the PREMISES, as described throughout this affidavit, to conceal evidence of day-to-day selling of narcotics, and that evidence of drug trafficking as I described above—such as drug ledgers, firearms and ammunition, drug-related manufacturing equipment and paraphernalia, and financial instruments such as cash—are likely to be found at the PREMISES.

## TECHNICAL TERMS

40.     Based on my training and experience, I use the following technical terms to convey the following meanings:

18

a. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

41. As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B). I know that BURTON uses at least one electronic storage medium—a cellular telephone—and that it likely contains evidence relevant to my investigation.

42. *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

19

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

43.  *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

20

a.  Data on the storage medium can provide evidence of a file that was once on the

storage medium but has since been deleted or edited, or of a deleted portion of a

file (such as a paragraph that has been deleted from a word processing file).

Virtual memory paging systems can leave traces of information on the storage

medium that show what tasks and processes were recently active.  Web browsers,

e-mail programs, and chat programs store configuration information on the

storage medium that can reveal information such as online nicknames and

passwords.  Operating systems can record additional information, such as the

attachment of peripherals, the attachment of USB flash storage devices or other

external storage media, and the times the computer was in use. Computer file

systems can record information about the dates files were created and the

sequence in which they were created, although this information can later be

falsified.

b.  As explained herein, information stored within a computer and other electronic

storage media may provide crucial evidence of the "who, what, why, when,

where, and how" of the criminal conduct under investigation, thus enabling the

United States to establish and prove each element or alternatively, to exclude the

innocent from further suspicion.  In my training and experience, information

stored within a computer or storage media (e.g., registry information,

communications, images and movies, transactional information, records of

session times and durations, internet history, and anti-virus, spyware, and

malware detection programs) can indicate who has used or controlled the

computer or storage media.  This "user attribution" evidence is analogous to the

search for "indicia of occupancy" while executing a search warrant at a residence.

The existence or absence of anti-virus, spyware, and malware detection programs

may indicate whether the computer was remotely accessed, thus inculpating or

exculpating the computer owner. Further, computer and storage media activity

can indicate how and when the computer or storage media was accessed or used.

For example, as described herein, computers typically contain information that

log: computer user account session times and durations, computer activity

associated with user accounts, electronic storage media that connected with the

computer, and the IP addresses through which the computer accessed networks

and the internet. Such information allows investigators to understand the

chronological context of computer or electronic storage media access, use, and

events relating to the crime under investigation. Additionally, some information

stored within a computer or electronic storage media may provide crucial

evidence relating to the physical location of other evidence and the suspect. For

example, images stored on a computer may both show a particular location and

have geolocation information incorporated into its file data. Such file data

typically also contains information indicating when the file or image was created.

The existence of such image files, along with external device connection logs,

may also indicate the presence of additional electronic storage media (e.g., a

digital camera or cellular phone with an incorporated camera). The geographic

and timeline information described herein may either inculpate or exculpate the

computer user. Last, information stored within a computer may provide relevant

insight into the computer user's state of mind as it relates to the offense under

investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

23

44. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

   a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

   b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware

24

and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

45.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

46.    Because several people may share TARGET RESIDENCE 1 and/or TARGET RESIDENCE 2 as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## AUTHORIZATION REQUEST

47.    Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

48.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

---

Respectfully submitted,

Eric J. McIntosh
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on February __9__, 2022

Karen L. Litkovitz
United States Magistrate Judge

26

## ATTACHMENT A

*Property to Be Searched*

The property to be searched is 294 South Walnut Street, Wilmington, Ohio 45177

(**TARGET RESIDENCE 2**), pictured below, and further described as a single-family residence

with tan siding, white trim, a light green front door, and an address number of "294" in black

letters posted on a white porch beam, over the front steps.



**ATTACHMENT B**

*Items to be Seized*

All items and records relating to violations of Title 21 U.S.C. §§ 841 and 846, those violations involving Christian Wayne BURTON and/or others and occurring on or after November 1, 2021, including:

a.  Any and all controlled substances (as defined under Title 21, United States Code, § 812), including, but not limited to, methamphetamine and fentanyl;

b.  Paraphernalia associated with the manufacture, distribution, sale, import, export, storage, conversion, preparation for sale and use of any controlled substances, including scales, measuring devices, bottles, balloons, baggies, plastic wrap, plastic envelopes, film canisters and cutting, conversion, and adulteration agents.

c.  Records showing evidence of importing, smuggling, and distributing drugs, including books, ledgers and diaries, address books and lists, buyer and seller lists, notebooks, IOU's, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records, wire transfer records, express consignment mailing labels (including Federal Express, DHL, U.S. Postal Express Mail, UPS, and other similar labels), evidence of offsite storage (such as storage locker receipts and safety deposit box rental records and keys), documents showing domestic or international travel (such as airline tickets, itineraries, passports, and the like), and receipts showing imports or exports (such as shipper's export declarations, bills of lading, invoices, tax identification number paperwork, and other similar documents).

d.  Currency (whether U.S. or foreign) and financial instruments, including travelers checks, bonds, stock certificates, cashier's checks, certificates of deposit, and money orders, derived from the sale of controlled substances in violation of Title 21, United States Code, § 841 and money wrappers, rubber bands, money containers, and money counting machines.

e.  Precious metals, jewelry or other high-value items that could be obtained with the proceeds of the sales of controlled substances.

f.  Any and all records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other high-value items that could be obtained with the proceeds of the sales of controlled substances.

g.  Any boxes, bags, briefcases, suitcases, containers, or other items that could be used to mail, carry, import, export, smuggle, or transport marijuana or any other controlled substances.

h.  Photographs (both paper and digital form) and video and audio recordings which document an association with other co-conspirators and/or display drug trafficking methods, narcotics, firearms, or money and proceeds from narcotics transactions.

i.  All records, documents, and materials showing control, possession, custody, dominion or other indicia of occupancy over physical premises, including but not limited to:  personal mail, checkbooks, personal identification, personal effects, notes, other correspondence, utility and other bills, internet service provider documents, letters, rent receipts, mortgage and loan documents,

financial documents, vehicle registration information or ownership warranties and keys.

j. Electronic or communication devices including, but not limited to, cellular telephones, smart phones, portable electronic devices such as tablet computers, laptops, iPads or electronic storage media, and other electronic or communication devices which could be used to facilitate drug trafficking.

k. Firearms and ammunition;

l. Firearms accessories, such as ammunition, ammunition magazines, silencers, gun cases, magazines and spare parts;

m. Firearms source records, including lists of prices, correspondence, notation logs, receipts, journals, books, telephone records, telephone bills, address books, bank statements, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold;

n. Photographs, video and audio recordings, text messages, chats, emails and other communications (and associated contact information), in electronic or other form, related to the possession, acquisition or transfer of firearms, firearms parts and accessories, or ammunition;

o. Firearms boxes, manuals, and receipts or other paperwork related to firearms transactions;

p. United States currency or other items of value representing the proceeds of firearms trafficking and/or drug trafficking;

      q. Documents pertaining to the importation of firearms and/or ammunition and proceeds derived from the sale therefrom, including invoices, shipping labels, tracking numbers, boxes, and envelopes

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

    2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant ("COMPUTER"):

      a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

      b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      c. evidence of the lack of such malicious software;

      d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

31

e.   evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.   evidence of the times the COMPUTER was used;

i.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.   records of or information about Internet Protocol addresses used by the COMPUTER;

l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.   contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing

or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.